Stewart, J.
The writer of the opinion of the Court of Appeals stated the essential facts in this cause so accurately that we are quoting and adopting his statement as our own. It is as follows:
“The American Cancer Society, Inc., is a membership corporation, not for profit, incorporated under the laws of the state of New York, and the Ohio Division, American Cancer Society, Inc., is a corporation, not for profit, organized under the laws of the state of Ohio. The city of Dayton has a commission-manager form of municipal government. The Ohio division of the society has been functioning in Ohio several years prior to 1950, and it has an organized unit in Montgomery county, operating in the city of Dayton and *116 Montgomery county; that through the local units the general program of the state and national organizations is implemented; that the local unit functions as such under the direction of a local executive committee, maintaining a local office under the direction of a salaried executive secretary. The corporate franchise of the Ohio division of the society provides:
“ ‘Collect and disseminate information concerning the symptoms, diagnosis, treatment and prevention of cancer; to investigate the conditions under which cancer is found and to compile statistics in regard thereto; to co-operate with and promote the work of the American Cancer Society, Inc., to solicit, collect, receive, hold, invest, reinvest, distribute and disburse donations, subscriptions, gifts, bequests and other funds for the purposes of this corporation; to aid, in co-operation with state and local medical societies, departments of health, cancer commissions, and other approved and interested health organizations, in the promotion of cancer programs and projects; to establish, maintain and administer units, branches, committees, field armies, and carry on any other activities, within the state of Ohio, to effect and carry out the purposes of this corporation; and the doing of any and all things necessary or incident thereto.’
‘ ‘ The franchise of the parent organization issued by the state of New York contains similar powers. For several years prior to 1950, the local unit had been conducting in Dayton and Montgomery county, an annual, combined educational membership and funds solicitation campaign in the month of April, simultaneously with like campaigns throughout the nation; that since 1946, such local campaigns have been conducted under a permit issued to the local unit by the city of Dayton under the ordinance in question; that in 1950, the local membership of said society consisted of approximately four thousand members; that the *117 funds collected and retained for local use were placed in a local bank; that the accounts have been audited; that at no time during its operation has there been any complaint charging it with fraudulent acts or mishandling of funds; that the funds collected were allocated and distributed according to a definite plan and policy, a certain percentage being retained by the local unit, a portion being distributed to the state organization, and a portion to the national organization; that on February 2, 1950, an application was made by the society for a permit to conduct its annual funds campaign, which was duly prepared, filed and acted upon by the solicitations advisory board, which on February 17,1950, passed a resolution rejecting said application on the ground that the permit granted to it for 1949 was conditioned upon the society becoming a member of the Dayton community chest organization, and that the Dayton community chest had collected $25,000, which was available for use in a campaign against cancer; that from this ruling- an appeal was taken to the city commission, as provided in said ordinance, which passed a resolution as follows:
“ ‘Whereas, the Montgomery county unit of the American Cancer Society, Inc., heretofore appealed, under the city ordinance granting such appeals, from the recommendation of the solicitations advisory board against the issuance of a permit to conduct a public campaign in the city of Dayton between April 15 and April 30, 1950; and
“ ‘Whereas, the commission having heard the various claims made on behalf of the said society in support of its application, finds that there has been allocated from funds publicly solicited in this community and is presently available to the society for the year 1950, the sum of twenty-five thousand dollars ($25,000), and that, prior to the said application, a permit had been issued for a campaign in behalf of *118 the Miami Valley Hospital in this city to be conducted within the same period; and
“ ‘Whereas, the commission therefore does not and cannot find that the object of the proposed cancer drive is not already adequately covered or that it will not be an unwarranted burden upon the persons to be solicited, or that it will not hinder the activity of any other organization to whom a permit has already been granted, or that such solicitation would not be incompatible with the public welfare; now, therefore,
“ ‘Be it resolved by the commission of the city of Dayton:
“ ‘Section 1. That, though the commission fully recognizes the constructive nature of the work of the said organization and is in sympathy with it, the application of the said Montgomery county unit of the American Cancer Society, Inc., referred to above, be and the same hereby is denied.’
“The court found that during the year 1950 the solicitations advisory board approved thirty-seven applications for permits for the solicitation of funds in the city of Dayton, by various organizations. The court further found that at the time the application for permit was refused, the*plaintiff-organization was the sole organization in the city of Dayton devoting its time exclusively to combating cancer and maintaining an office and organization for such purpose; that there was at said time no organization in the Dayton community chest or any organization allied with the Dayton community chest engaged in such work. The court further found that the society could not have used the funds indicated as being in the community chest without becoming a member thereof, and that the administration of such funds by the society would have been under the supervision of the community chest. The court found that the program and work of the society was for the public benefit, public welfare *119 and health, and that the said program was not injurious to the public in the city of Dayton; and that the solicitation of funds was not attended by fraud or injury to the public of said city.
“We now set forth the several applicable sections of the ordinance which were in full force and effect at the time the application for permit was made and refused. Section 638 provides as follows:
“ ‘No person, organization, society, association or corporation, and no agent, member, or representative thereof, shall solicit money, donations, property, or financial assistance of any kind, sell or offer to sell any article, service, publication, advertisement, ticket or subscription, on the direct or implied plea that such solicitation or sale is for charitable, educational, civic, patriotic, religious, or philanthropic purposes, on the streets, in office or business buildings, by house to house canvass, in any public place, by telephone or by mail, or in any other way in the city of Dayton, unless the organization making the solicitation, sale, or offer shall possess a permit issued under the regulations as in this ordinance set forth.’
“By related sections, certain transactions and promotion plans are exempted from the provisions of the ordinance, which are not material here.
‘ ‘ Sections 638-3, 638-4 and 638-5 provide as follows:
“ ‘Section 638-3. Solicitations advisory board. There is hereby created a solicitations advisory board which shall be composed of such number of members as may be appointed by the city commission. The members of such board shall be appointed for a term of two years, shall serve without remuneration for their services as such members and need not be residents of the city of Dayton.
‘ ‘ ‘ Section 638-4. Consideration of applications. All applications received by the director of public welfare as aforesaid shall be turned over to the solicitations *120 advisory board, which shall take into consideration the following: As to whether or not it believes that the applicant is proposing to serve an object, purpose, or movement in a field not already covered, or, if so, not adequately covered, representing a public charity or a charitable, philanthropic, or educational organization or enterprise, or other educational purpose, and that same will be beneficial to the people of the city of Dayton, and will not be an undue or unwarranted burden upon the class of persons who will be solicited to contribute thereto, and will not interfere with or hinder or prevent the activity of any person, persons, or organization to whom permit hereunder has already been granted; that the cause for which the solicitation is to be made is in fact charitable, educational, civic, patriotic, religious, or philanthropic; that at least seventy-five per cent of the gross proceeds of such sales promotion or solicitation will be used for such purpose; that such solicitation or sales promotion is not promoted or conducted primarily for the private profit of its promoters; and that it is not incompatible with the public welfare. After investigation, said board shall make recommendation to the city manager as to whether or not a permit should be issued.
“ ‘Section 638-5. Issuance of permit. Upon receipt of such application with recommendation that a permit be granted, together with bond as required by this ordinance, the city manager shall issue a permit therefor. Such permit shall not be issued for a period longer than thirty days, and shall become null and void upon conviction of the applicant or any officer, agent, or representative thereof of the violation of any provision of this ordinance. Such permit shall specify the method of solicitation, or raising of funds, the purpose thereof, the method of distribution, and the number of solicitors or representatives to be engaged in the actual field work or solicitation thereof, and it *121 shall he unlawful for any person to act as such solicitor or representative without having on his person a certified copy of such permit or such modification thereof as the city manager may adopt, but same must be under the signature of the city manager or his secretary. ’
“Section 641 provides the penalty for a violation of the provisions of the ordinance.”
Hereinafter we shall refer to the Montgomery county unit as the applicant, to the solicitations advisory board as the board, to the city commission as the commission, and to the city of Dayton as the city.
Although many errors were urged by the city in the Court of Appeals, the chief question presented and argued in this court concerns the constitutionality of sections 638-4 and 638-5, supra.
It is axiomatic that courts must always indulge a strong presumption in favor of the constitutionality of legislation, and that a court will not pass upon the constitutionality of a statute or ordinance unless or until it becomes necessary to do so in order to dispose of the case before it. Village of Strongsville v. McPhee, 142 Ohio St., 534, 53 N. E. (2d), 522.
We, therefore, are of the opinion that only sections 638-4 and 638-5 need be considered in the disposition of the present case.
It is fully agreed that the applicant is a worthy charitable organization; that permission for it to conduct educational and solicitation campaigns has been granted in the years preceding the one in which its application was refused; and that the refusal was based solely on the grounds that funds were collected by the community chest for the same objective as that of applicant, that a permit had been issued for a campaign in behalf of the Miami Valley Hospital within the same period applied for by applicant, that the proposed cancer drive of applicant was already adequately covered, that it would be an unwarranted bur *122 den upon the persons to be solicited and would hinder the activity of another organization to which a permit had already been granted, and that applicant’s solicitation would be incompatible with the public welfare.
Section 1, Article XIV, Amendments, Constitution of the United States, provides in part:
“No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.’’ ’
The word, “liberty,” as used in the Fourteenth Amendment, includes the liberties of freedom of speech and of the press as guaranteed by the First Amendment. Cantwell v. Connecticut, 310 U. S., 296, 303, 84 L. Ed., 1213, 60 S. Ct., 900.
In the Ohio Constitution, Section 1, Article I, protects the liberty of the individual, Section 2, Article I, guarantees equal protection, and Section 11, Article I, guarantees freedom of speech and of the press.
Under the foregoing constitutional provisions, there can be no doubt that educational promotion and solicitation of funds for worthy charitable organizations by those interested in them come within the constitutional guaranties of freedom of speech, freedom of the press, and liberty of action. However, practically all constitutional guaranties are subject to the police power of the state and may be regulated in the interest of the welfare, safety, or health of the people.
There can be no doubt that solicitations for charities are subject to the police power and that such solicitations may be reasonably regulated in order to protect the people from deceit, fraud, or the unscrupulous obtaining of money under a pretense that such money is being collected for a charitable purpose. However, such police regulation must have a relation to the welfare, safety, or health of the community and can not *123 be arbitrarily, indiscriminately or whimsically exercised for reasons which have no relationship to snch objectives.
It is stated as follows in 5 McQuillin on Municipal Corporations (3 Ed.), Section 19.32:
“The occupation of soliciting for charities is subject to the police power so far as relates to a reasonable supervision over the persons so engaged and for the application and use of the contributions received to the purposes intended, in order to prevent unscrupulous persons from obtaining money or other things under the pretense that they are to be applied to charity, and to prevent the wrongful diversion of such funds to other uses, or to secure them from waste. Measures reasonably tending to these ends are unquestionably valid. On the other hand, since every person has the right to solicit contributions for charity if he acts in good faith and makes an honest application of the funds so obtained, regulations of this character which are arbitrary and which assume to say what person or what institution may or may not engage in charitable work are objectionable, as a denial of a common right. The police power can not be used in such an arbitrary, unreasonable and oppressive manner.”
In the case of In re Dart, 172 Cal., 47, 54, 155 P., 63, L. R. A. 1916D, 905, Ann. Cas. 1917D, 1127, it is stated:
“And the utmost limit of reasonable regulation in the matter is reached by acts protecting the public from charlatans and imposters, insuring knowledge on the part of the donors of the purposes to which their contributions may be put, coupled with adequate safeguards against malversation as to the funds received. ’ ’
The city has the power to enact an ordinance to protect itself from charlatans and imposters and insuring knowledge on the part of donors to charities of the purposes to which their contributions may be put, *124 coupled with adequate safeguards against the misuse or diversion of the funds raised by the charities. The city may by general and nondiscrimihatory legislation regulate the time, place, and the manner of soliciting, and may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent, and may require information which will insure that the purpose of the solicitation will be free from any element of deceit and fraud. Cantwell v. Connecticut, supra.
Sections 638-4 and 638-5, without laying down any standards or rules, properly within the police power, for the guidance of either the board or commission, give it arbitrary power to recommend the granting of permits to solicit for charity depending on whether the board or commission believes that the applicant for the permit proposes to serve an object, purpose or movement in a field not already covered, or, if so, not adequately covered; that the applicant represents a charity which will be beneficial to the people of Dayton and will not be an undue and unwarranted burden upon the persons who will be solicited; and that the solicitation will not interfere with, hinder or prevent the activity of any person or organization to which a permit has already been granted.
What is to be determined in reference to these matters is based upon an appraisal of facts, an exercise of judgment, and a formation of an opinion, with no standards, properly within the police power, laid down in the ordinance governing such mental processes.
As was said by Mr. Justice Roberts, who delivered the opinion of the court in the Cantwell case, supra:
“He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of *125 facts, the exercise of judgment, and the formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment and included in the liberty which is within the protection of the Fourteenth. ’ ’
An administrative agency may make subordinate rules or find facts under authorization by a legislative body, but the legislative body must establish a policy and fix standards for the guidance of the administrative agency in performing its function. Belden v. Union Central Life Ins. Co., 143 Ohio St., 329, 55 N. E. (2d), 629.
The sections of the ordinances, involved in the present case, lay down no standards as to whether a charitable field is already adequately covered by solicitation but leave it entirely to the judgment of the board and the commission. The sections likewise lay down no standards as to what will be beneficial to the people of Dayton but leave that question to the whimsical judgment of the board and commission. The same situation prevails as to whether the issuance of a permit will interfere with, hinder or prevent the activities of any person or organization to which a permit has already been granted.
We know of no law which authorizes reasonable regulation to include the power to determine which of two equally charitable organizations may be permitted to solicit in a particular field or which gives a legislative body the authority to give the power to decide, without standards or rules properly within the police power, whether one worthy charity shall have an opportunity to present its case to the public and another shall not be entitled so to do.
The city argues strenuously that, even if the powers granted to the board and the commission are arbitrary, *126 discriminatory, and unconstitutional, their action should be upheld because one of the reasons given by the commission in its action with reference to applicant is that a permit had been issued to the Miami Valley Hospital to solicit during the time for which applicant had applied.
The city argues that it is within its police power to reasonably regulate the time and place for solicitation and that, therefore, the board and commission were within their constitutional rights in denying the permit to applicant as it would conflict as to time with the permit granted to the hospital.
There are two answers to. this contention.
The first answer is that there is nothing in the ordinance sections under consideration providing for any regulation of the time for solicitations. It might well be argued that if the ordinance provided that no more than one or a certain number of solicitations could be had in Dayton at one time, and such a provision was equally applicable to all persons or organizations who desired permits for solicitation, such a regulation might come within the police power. However, in the present case, for aught that appears, the order with reference to protecting the Miami Valley Hospital from interference by applicant was arbitrary and discriminatory.
The record shows that, during the year 1950, 37 applications for permits for the solicitation of funds in Dayton were approved by the advisory board, and some of the solicitations obviously must have overlapped.
The second answer to the city’s contention is that ■ the monopoly of time granted to the hospital for its solicitation was only one of the reasons given for the denial of applicant’s permit. In fact, the only reasons given by the board for its denial were that the permit granted to applicant the prior year was conditioned upon it becoming a member of the community chest, *127 and that the community chest had collected $25,000 which was available for use against cancer.
The board apparently did not even consider the question of the permit previously granted to the hospital. It was the commission which based its refusal, in addition to the $25,000 raised by the community chest, upon the prior permit to the hospital and the commission’s opinion that the proposed cancer drive was already adequately covered, that it would be an unwarranted burden upon the persons to be solicited, that it would hinder the activity of any other organization to which a permit was already granted, and that the solicitation would be incompatible with the public welfare.
The Cantwell case, supra, concerned an interpretation of a statute of Connecticut which provided that no person shall solicit money for any alleged religious, charitable or philanthropic cause unless such cause had been approved by the secretary of the public welfare council.
The conviction of some of the members of Jehovah’s Witnesses was reversed because the legislation was held to be in violation of the First and Fourteenth Amendments to the federal Constitution.
Although, as we have stated, the court there said that legislation may regulate the time and manner of solicitation generally in the interest of public safety, peace, or convenience, legislation can not condition the solicitation upon a license, the granting of which rests on the determination by a state authority as to what is a religious cause.
The Cantwell case was not weakened by the decisions of the United States Supreme Court in Jones v. Opelika, 316 U. S., 584, 86 L. Ed., 1691, 62 S. Ct., 1231, and Breard v. Alexandria, 341 U. S., 622, 95 L. Ed., 1233, 71 S. Ct., 920. Indeed, in the Jones case, Mr. Justice Reed stated as follows what' was decided in the Cantwell case:
*128 “In the Cantwell ease, the secretary of the public welfare council was to determine whether the object of the charitable solicitation was worthy * * *. We held the requirement bad.”
The line which separates the lawful vesting of power for administrative purposes and the delegation of legislative, discretionary and unreasonable power is frequently a thin one obscured in a twilight zone, but a legislative body can not vest powers in a commission which restrict persons or organizations unless in the legislation there is set up some standards of action which relate to legitimate objects for the exercise of the police power and which operate equally upon all persons and organizations. A law which operates arbitrarily and with discrimination upon those engaged in the same enterprises can not be valid, nor can one which gives arbitrary powers to a commission which are in no way related to the public health, safety, or welfare.
Although the board and the commission doubtless acted in good faith, it is obvious from what we have said that sections 638-4 and 638-5 are invalid as not reasonably related to the public welfare and grant powers to a commission giving it a right to restrict privileges of organizations and persons, without standards, properly within the police power, to guide it, thus enabling it to exercise arbitrary powers in conflict with constitutional guaranties.
We do not pass upon the other sections of the city’s solicitations ordinance, for it was assumed by both applicant and the city that applicant had complied with all the provisions of the other sections, as to information required and as to the bond to be given to guarantee the proper disposition of the funds to be collected.

Judgment accordingly.

Middleton, Taet, Matthias, Habt and Zimmerman, JJ., concur.